**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JULIE A. ARNOLD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cv-1083** |
| | ) | **Judge Trauger** |
| **RELIANT BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Defendant Reliant Bank's Motion for Summary Judgment (Docket No. 28), to which the plaintiff has filed a response (Docket No. 44), and the defendant has filed a reply (Docket No. 47). Also before the court is the Plaintiff's Motion for Partial Summary Judgment (Docket No. 31), to which the defendant has filed a response (Docket No. 36). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part, while the plaintiff's motion will be denied.

## BACKGROUND

The plaintiff, Julie A. Arnold, was employed as a mortgage loan originator ("MLO") at Reliant Bank ("Reliant") from January 28, 2010 until May 19, 2011.[1] Reliant maintains four

---

[1] Unless otherwise noted, the facts are drawn from Reliant's statement of undisputed facts in support of its summary judgment motion (Docket No. 30), the plaintiff's responses thereto and statement of additional undisputed facts (Docket No. 45), Reliant's responses to the plaintiff's statement of additional undisputed facts (Docket No. 48), and related exhibits. They are also drawn from the plaintiff's statement of undisputed facts in support of its partial motion for summary judgment (Docket No. 32), Reliant's responses thereto (Docket No. 37), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party.

locations in and around Nashville, Tennessee and houses its main branch in Brentwood, Tennessee.  In this action, the plaintiff alleges that Reliant is liable for: (1) discriminating against her on account of her gender by withholding commissions, failing to assign her business, excluding her from meetings and outings, and terminating her employment; (2) creating a hostile work environment; and (3) failing to pay her overtime.  (*See* Docket No. 1.)

The plaintiff was hired by Brian Shaw, Reliant's Executive Vice President and Chief Retail and Deposit Officer, and David Driggs who, at the time, was a Senior Vice President and Mortgage Manager with the bank.  Shaw and Driggs consulted with Diane Crenshaw, Reliant's Vice President of Mortgage Operations, and Mindy Logan, the bank's Human Resources Officer, in reaching their decision to hire the plaintiff.  Driggs was also an MLO and supervised the plaintiff at all relevant times.

MLOs at Reliant work with customers who are seeking to obtain mortgage loans.  During the course of the plaintiff's employment, Reliant employed approximately six MLOs at any one time.  Initially, the plaintiff was assigned to work at the bank's Maryland Farms branch, which was also located in Brentwood.  Reliant's mortgage loan office was based in this branch and the majority of its MLOs were stationed there.  However, in May 2010, an opportunity arose for one MLO to work at the bank's main branch.  The plaintiff sought Driggs' permission to transfer to this location, believing that it might provide her with better opportunities to generate mortgage business.  Driggs granted her request and she served as the sole MLO at the main branch.

---

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

After the transfer, the plaintiff outperformed every other MLO with respect to gross mortgage sales financed through the bank's Mortgage Department. She earned quarterly awards in recognition of her sales performance. Indeed, after the first quarter of 2010, the plaintiff was the top sales performer in each subsequent quarter up until her employment ended in May 2011.

During the first few months of her employment, the plaintiff held positive views regarding her experiences at Reliant. On May 17, 2010, she completed a written Introductory (90-day) Employee Interview form in which she confirmed that "[s]o far the Bank and every part of it (employees, upper management, benefits, etc. . . ) have far surpassed my expectations. I feel incredibly blessed to be a part of such an amazing organization." The plaintiff also added that "David [Driggs] is awesome. Couldn't ask for a more positive, upbeat, outgoing leader." The following day, Driggs completed the plaintiff's Introductory (90-day) Evaluation in which he rated her overall performance to be "Very Good." He noted, however, that the plaintiff needed to improve her performance on certain compliance issues related to the loan files she assembled.

According to the plaintiff, things took a negative turn in the summer of 2010, after she began winning sales performance awards. Her relationship with Driggs is alleged to have changed from that point forward. The plaintiff claims that Driggs once referred to her as the "woman that makes all the money" when she walked by his office. She also asserts that he began to make numerous comments to the effect that the men needed to "take back" the mortgage department from the women. The plaintiff testified that several of these comments were made during Reliant's weekly sales meetings, held each Monday morning, that were

attended by loan officers and Vice President of Mortgage Operations Diane Crenshaw. Initially, the plaintiff believed that Driggs' comments concerning the need for the men to take back the mortgage department were probably made in jest. However, after Driggs continued to repeat them, she began to feel that he did not want her to succeed. According to Reliant, Driggs' comments about the men taking over were a joke, meant to motivate the entire sales team to increase production.

Driggs also made a comment to another female employee about using "man power" to "take the plaintiff down." The plaintiff referenced this comment in an email to Driggs on January 25, 2011:

> Just heard thru the grapevine . . . you are gonna take me down! Man Power or something like that??????????
>
> What happened to you being my boss . . . my mentor . . . my supervisor????? Aren't you suppose[d] to build me up and hope I do good . . . and HELP me do good for the good of the bank?

Driggs responded via email the following morning:

> The grapevine known as Medley likes to stir the pot and got me worked up about girl power, so I snapped!!! Still your buddy, promise. (I was the next highest on the list though [apparently referring to the list of top sales performers], just saying!)

Shortly thereafter, the plaintiff wrote: "LOL. That's cool. I'm afraid that 'traveling trophy' may be sitting in someone else's office next quarter. :-(." After Driggs wrote "[w]hat's with that attitude?!?!?!," the plaintiff ended the e-mail chain stating that she was "[j]ust try'n to be realistic. :-)."

In the plaintiff's view, Driggs may not have possessed a bias against women generally, but she nonetheless believed that he was intimidated by her because of her success as an MLO. Indeed, she asserts that both Driggs and another male MLO, David Perkins, always seemed to be close behind her in terms of selling mortgage loans. It is undisputed that Driggs hired two additional female MLOs after he hired the plaintiff. However, the plaintiff testified at her deposition that Driggs fired one of these two female MLOs and that the other one quit.[2]

The plaintiff also claims that she was excluded from golf and hunting outings attended by Driggs, Perkins, and other unidentified male MLOs. While the plaintiff golfs, she does not hunt. It is undisputed that the plaintiff never informed Driggs, Perkins, or any other male MLO of her desire to attend these golf and hunting outings. In addition, she testified at her deposition that her compensation at work was not negatively affected as a result of being excluded. Moreover, the plaintiff claims that Driggs and a group of unnamed male MLOs attended the funeral of a loan officer she knew without inviting her or otherwise informing her about the services. It is undisputed that the deceased individual was not a Reliant employee and that the funeral was not a work-related matter. There is also no evidence in the record indicating that any of the male MLOs were aware of the fact that the plaintiff knew the deceased individual.

On November 5, 2010, the plaintiff completed her 2010 Annual Performance Evaluation Employee Self-Assessment. In that document, she wrote:

> I seriously LOVE working here. I absolutely adore everyone I work with and I feel totally blessed by being a part of this company. It is

---

[2] The plaintiff lacked personal knowledge regarding the reasons for these two employees' departures.

> so satisfying to come to an environment where it is pleasant and fun
> and a place that allows me to basically "run" my business. It's so
> awesome that Brian [Shaw] and DeVan [Ard] [Reliant's President
> and CEO] actually listen to my ideas about how to make a loan work
> and actually put those ideas in motion.

The plaintiff testified at her deposition that, in making the above comments, she was specifically referring to her experiences at Reliant's main branch. The annual self-assessment also asked her whether there were any aspects of her job that prevented her from performing at her highest level and from feeling fulfilled. The plaintiff responded "[n]ope" followed by a smiling emoticon.

Approximately one month after she completed her annual self-assessment, Driggs prepared a memorandum to the plaintiff's personnel file concerning his discovery of the fact that she had been charging additional fees on mortgages that she was keeping as income. In the memorandum, Driggs wrote that he informed the plaintiff that charging additional fees for her own personal gain was inappropriate. While he pointed out that MLOs at Reliant sometimes charged customers with additional fees, he stated that those fees were applied to offset certain processing costs and that any unused portion would be credited back to the customer after their loan closed. He thus withheld certain commissions tied to the mortgages in which the plaintiff charged additional fees. While he noted that the plaintiff's conduct was, in his opinion, unethical, he wrote: "In Julie's defense, she learned that this is being done on occasion, but was unaware of the money being used to offset expense or given back to the consumer when not used." Unhappy that some of her commissions were withheld, the plaintiff complained to Brian Shaw, to whom Driggs reported, and was reimbursed 80% to 90% of the withheld commissions.

According to the plaintiff, Driggs singled her out for charging additional fees on mortgage loans. She claims that another male MLO, Anthony Wade, similarly added fees to mortgages but did not have any of his commissions withheld. At her deposition, she testified that she began charging higher fees after she overheard other unnamed individuals at an unspecified meeting discussing how Wade had "upped certain fees in order to make extra commissions in his pocket." After some of her commissions were withheld, the plaintiff claims that she asked Wade whether Driggs had ever withheld his commissions. Wade apparently told the plaintiff that he has never had any of his commissions withheld.

According to the plaintiff, Driggs also never withheld any commissions from Perkins. Driggs is also alleged to have assigned Perkins "leads" for business that came into Reliant's Maryland Farms branch, while withholding such leads from the plaintiff. Both Driggs and Perkins worked at the Maryland Farms branch. The plaintiff learned of the alleged practice concerning leads being funneled to Perkins from Kim Livingston, a former female MLO at Reliant, and admitted at her deposition that she did not possess any personal knowledge concerning how leads were specifically assigned at the Maryland Farms branch. She testified that, at Reliant's main branch, the protocol was for the staff "to direct any leads they had to me because I was the" only MLO at that location.

The plaintiff alleges that she complained to Vice President Diane Crenshaw about Driggs' conduct. She testified that she considered Crenshaw to be a friend and spoke to her frequently. During one of their conversations, she expressed to Crenshaw how much she enjoyed working at Reliant and how she wished to grow with the company and excel. Upon

hearing this, Crenshaw told the plaintiff that she would not be able to advance at the bank "because she did not have a penis."

On December 27, 2010, the plaintiff received her 2010 Annual Performance Evaluation. While the plaintiff's overall performance was rated as "Good," she received "Below Average" rankings in the categories of "Judgment," "Attendance," and "Communication Skills." With respect to the judgment category, Driggs wrote in the evaluation that he wanted to see the plaintiff work on the following items:

> [S]etting realistic expectations for the borrowers and referral sources, both internal and external, being proactive in addressing the challenges in her loans that ultimately end up killing a deal, basically, letting the bad loans go sooner, be very sensitive about any and all perceptions of personal income or gain on any mortgage she is working on, and lastly, be consistent on any and all fee structure for all borrowers.

As for the attendance category, Driggs noted that the plaintiff was consistently late to sales meetings. He also noted that punctuality would be closely monitored for all sales meeting attendees in 2011. Finally, with respect to the plaintiff's communication skills, Driggs found that she complained about employees directly to her co-workers instead of to management.

On May 19, 2011, the plaintiff learned that she was being terminated during a meeting with Driggs and Mindy Logan at Reliant's main branch. According to Logan, Driggs informed her a couple of days earlier about the plaintiff's performance issues and how things had appeared to go downhill following the plaintiff's December 2010 annual evaluation. Logan added that Driggs then submitted a document to her, detailing the plaintiff's alleged performance issues.

Shortly thereafter, Driggs, Logan, and Shaw made the decision to terminate the plaintiff's employment.

The following day, Logan prepared a memorandum, summarizing what was discussed during the May 19th meeting. The memorandum stated that the plaintiff was being terminated from the bank for performance issues. It noted that the following performance issues were discussed: (1) the plaintiff's failure to analyze the financial information of a self-employed client prior to submitting a loan for processing; (2) her rude and abrasive behavior to staff members at Reliant's Operations Department; (3) her failure to properly complete loan forms; and (4) her inaccessibility to clients. The memorandum also noted that other issues were discussed, including the plaintiff's comments to co-workers concerning her financial difficulties and negative impression about certain bank processes and her attempt to push mortgage loan files into underwriting before they were fully processed. According to the memorandum, Driggs claimed that he had previously discussed the aforementioned issues with the plaintiff.

At her deposition, the plaintiff testified that Logan told her that she was being discharged because she was inaccessible to customers, submitted incomplete loan files, spoke poorly about the bank, and apparently made a fellow co-worker cry. The plaintiff denies that she engaged in this or any of the other conduct outlined in Logan's May 20, 2011 memorandum. She also denies receiving any coaching or counseling from Driggs prior to her termination. Indeed, she claims that Driggs treated another unnamed male MLO who violated certain bank standards more favorably than her because he coached and counseled the male MLO pursuant to the bank's progressive discipline policy. Logan testified at her deposition that this MLO engaged in some

sort of activity in connection with his own Reliant checking account that allegedly violated certain unspecified bank standards.[3]

On the day of her termination, the plaintiff accepted a position with another financial institution, F&M Bank. She had actually received an offer of employment from F&M a few months before she was discharged. While F&M's compensation package was more lucrative, she initially declined the offer because she "liked Reliant Bank."

As previously noted, in addition to her discrimination claims, the plaintiff also asserts that Reliant failed to pay her overtime wages. Reliant classified the plaintiff as an employee exempt from the overtime requirements contained in the Fair Labor Standards Act ("FLSA"). While the plaintiff earned a guaranteed salary during the first two months of her employment, she was paid exclusively on a commission basis thereafter. Her commissions were based on the amount of revenue generated from the closed loans she produced. The plaintiff earned in excess of $100,000 per year as an MLO while she was employed at Reliant.

In July 2010, Reliant updated the plaintiff's job description. The updated document stated that the purpose of the plaintiff's job was to grow Reliant's "Mortgage department revenue by creating and implementing an effective sourcing and sales plan . . . for the ongoing promotion and sale of mortgage products to qualified clients." It also provided that her job duties were to generate or maintain existing business by making sales and networking calls, developing a referral base, establishing a sales and marketing plan, producing quality mortgage

---

[3] Logan added that she could not speak about the matter in any more detail because it involved a customer bank account.

loans that conform to underwriting guidelines, maintaining detailed product knowledge, and performing other duties incidental to her sales activity. (*Id.*) The plaintiff admitted at her deposition that the updated job description accurately expressed Reliant's expectations of her as of July 2010. Reliant also expected the plaintiff to meet certain performance standards that included benchmarks for monthly and annual revenue.

As an MLO, the plaintiff was given latitude to manage her own affairs. She obtained business leads from co-workers and also maintained her own pre-existing database of potential customers that she built and updated over time. She also had referral sources outside the bank that supplied her with potential customers.

While Reliant is open from 8:00 a.m. to 5:00 p.m. Monday through Friday, the plaintiff worked outside the office before and after business hours. Indeed, her workday commenced at 7:00 a.m. and often ended as late as 10:00 p.m. While working outside of normal business hours, she used her smartphone to call and email customers from her car or home to answer questions concerning their loans. She also spent 2-3 hours on Saturday and an hour every Sunday night performing work tasks. According to the plaintiff, she worked 70 to 75 hours per week.

The parties offer contrasting accounts of how the plaintiff went about her day during the bank's business hours. Reliant claims that the plaintiff regularly met with customers outside the office. It relies on the plaintiff's deposition testimony that she once met with customers at a Starbucks to review mortgage paperwork, went to a customer's office to pick up loan papers, met a customer at home on business, and attended Chamber of Commerce meetings one to two times

per month.  In addition, it has submitted four declarations from current and former bank employees, each stating that the plaintiff was out of the office for substantial periods of time during business hours.  Three individuals, David Driggs, bank President and CEO DeVan Ard, Jr., and former main branch Assistant Manager Clinton McCain, each stated in their declarations that the plaintiff spent the majority of her workweek outside the office.  The fourth, Brian Shaw, stated that the plaintiff frequently came and went throughout the workday and did not consistently work in her office during the workweek.[4]  Aside from Driggs, each of these declarants worked at Reliant's main branch during the time the plaintiff was stationed there. Indeed, during the relevant time period, Shaw's office faced the plaintiff's, while McCain's was adjacent.

Driggs stated in his declaration that he possesses personal knowledge regarding the plaintiff's job duties because he monitored her sales performance, reviewed the mortgage loans that she sold, met with her at sales meetings, and regularly spoke with her concerning her sales performance and work duties.  According to Driggs, the plaintiff was regularly outside the office making sales calls during the workweek.  In particular, he stated that she was in the office during only 20% to 25% of the workweek, while spending the remainder outside, either making sales calls or engaging in sales support duties.  Driggs also asserted that, when the plaintiff was at a Reliant bank branch, she undertook various sales support duties, which included: (1) calling,

---

[4] McCain similarly stated that the plaintiff left the main branch frequently throughout the day.

emailing, or meeting with customers; (2) attending sales meetings; (3) speaking with underwriters; and (4) completing mortgage loan paperwork.

The plaintiff, on the other hand, claims that she spent the overwhelming portion of her time during the bank's business hours inside the office. In particular, she testified at her deposition that she spent 80%-90% of her workday at Reliant's main branch or at Maryland Farms. She added that most of her customers came to the office to meet with her. The plaintiff asserts that, while working inside, she assembled loan applications, communicated with customers and underwriters, cleared loan conditions, and personally met with customers and internal co-workers.

The plaintiff commenced this action on November 14, 2011, asserting claims for: (1) gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* (2011); and (2) unpaid overtime wages under the FLSA, 29 U.S.C. § 201, *et seq.* (Docket No. 1 at 3-6.) The plaintiff initially sought to pursue her FLSA claim as a collective action on behalf of all current and former MLOs who previously worked at Reliant. (*Id.* at 6.) However, on August 2, 2012, the court denied the plaintiff's motion seeking expedited court-supervised notice to members of the putative class. (Docket No. 21.) On February 8, 2013, both parties filed their respective motions for summary judgment. (Docket Nos. 28, 31.)

## ANALYSIS

### I.    Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, a moving plaintiff must show that the defendant cannot raise a genuine issue of fact regarding any element of the relevant claims. In both instances, "[i]n evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II. The Pending Motions

Reliant has moved for summary judgment with respect to the plaintiff's Title VII, THRA, and FLSA claims. In particular, it argues that the plaintiff's disparate treatment claim should be dismissed because she has failed to adduce either direct or circumstantial evidence sufficient to survive summary judgment. (Docket No. 29 at 5-13.) Reliant also argues that the plaintiff has failed to show that its alleged conduct unreasonably interfered with her work performance and

created an environment that was intimidating, hostile, or offensive.  (*Id.* at 14.)  As for the plaintiff's FLSA claim, Reliant contends that she was properly classified as an exempt outside sales employee.  (*Id.* at 17-20.)

The plaintiff has also moved for summary judgment concerning her FLSA claim for unpaid overtime wages.  (Docket No. 31.)  She specifically contends that she regularly worked over 40 hours per week but was denied overtime compensation, because Reliant improperly classified her as an exempt outside sales employee.  (Docket No. 33 at 1.)  The court will address the parties' respective arguments concerning the relevant issues in turn.

### A.    Title VII and THRA Gender Discrimination Claims

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Such conduct is also prohibited by the THRA.  *See* Tenn. Code Ann. § 4-21-401(a)(1) (2011); *see also Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (applying identical analysis to claims brought under Title VII and the THRA).  An employer is liable under Title VII when the plaintiff shows that the defendant had a discriminatory intent or motive in taking a job-related action.  *Id.* (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).  A plaintiff can demonstrate this intent by presenting either direct or circumstantial evidence.  *Id.*

Direct evidence of discriminatory intent is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th

Cir. 1999). Such evidence does not require any inferences to be made in order to conclude that the challenged employment action was motivated, at least in part, by discriminatory animus against members belonging to a protected group. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). Direct evidence must not only establish that an employer "was predisposed to discriminate on the basis [of gender,] but also that the employer acted on that predisposition." *Id.* (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). "[A] facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Once an employee shows that unlawful discrimination was a motivating factor in the adverse employment action, "the burden of both production and persuasion shifts to the employer to prove that it would have [undertaken the same action] even if it had not been motivated by impermissible discrimination." *See id.*

The plaintiff contends that the following statements made by David Driggs constitute direct evidence that she was terminated on account of her gender: (1) his comment that the plaintiff was the "woman that makes all the money;" (2) his numerous remarks to the effect that the men needed to "take back" the mortgage department from the women; and (3) his statement to a female employee that he was going to use "man power" to "take the plaintiff down." (Docket No. 44 at 8-9.) She also contends that Vice President Diane Crenshaw's statement that the plaintiff would never be able to grow and excel at Reliant "because she did not have a penis" constituted direct evidence of discrimination. (*Id.*)

Because Reliant is the party seeking summary judgment on this claim, the court must draw all reasonable inferences from the factual evidence in the plaintiff's favor. *Moldowan*, 578

16

F.3d at 374. This evidence shows that the plaintiff was the top sales performer in the mortgage department at all relevant times. During the course of her employment at the bank, the plaintiff experienced three adverse employment actions - the withholding of commissions, the failure to be given leads, and termination - all of which occurred after she became the top sales performer.[5] Driggs, her direct supervisor, possessed decision-making authority with respect to each of these actions. Holding such authority, he expressed a desire to essentially relegate members of a protected class, including the plaintiff, through his repeated comments about "taking back" the department and his pledge to use "man power" to bring the plaintiff down. In the court's view, Driggs' statements create a genuine dispute of material fact concerning whether unlawful discriminatory animus was at least a motivating factor in the three alleged adverse employment actions at issue here.[6] *See Nguyen*, 229 F.3d at 563 (noting that "a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent.")

---

[5] Reliant does not dispute that the withholding of commissions and failure to assign leads are actionable adverse employment actions. However, it does argue that Driggs and other male MLOs' failure to invite the plaintiff to golf, hunt, or attend a funeral did not constitute an adverse action. (Docket No. 29 at 7-8.) The plaintiff did not address this particular argument in her opposition brief and appears to have conceded the point. (*See* Docket No. 44 at 10.) In any event, the court agrees that the plaintiff's exclusion from the aforementioned activities were nothing more than petty slights or minor annoyances and thus did not constitute adverse employment actions. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (noting that adverse employment actions must be something more than "petty slights, minor annoyances, and simple lack of good manners").

[6] Crenshaw's statement, however, does not constitute direct evidence because she did not participate in any of the challenged employment actions at issue. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (noting that comments made by individual not involved with the challenged employment decision cannot constitute direct evidence); *see also Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (same).

Because the court concludes that the plaintiff has adduced evidence that discriminatory animus was at least a motivating factor in the alleged adverse employment actions that she suffered, it finds that she has successfully established a prima facie case of gender discrimination through the direct evidence framework. Reliant has failed to contend that, even assuming that discrimination was a motivating factor in the adverse employment decisions at issue, it would have made the same decisions even if no such motive existed. (Docket No. 29 at 5-6; Docket No. 47 at 4-5.) Accordingly, the court's analysis of the direct evidence case need not proceed any further at this stage. Moreover, in light of its finding that there is a genuine dispute of material fact concerning the existence of direct evidence, it is also unnecessary for the court to analyze whether the plaintiff can establish discriminatory intent through circumstantial

evidence.[7]  Reliant's motion for summary judgment with respect to the plaintiff's Title VII and

THRA gender discrimination claims will therefore be denied.

### B.  Title VII and THRA Hostile Work Environment Claims

---

[7] However, the court notes that the plaintiff's evidence would fail to establish a prima facie case of gender discrimination under the applicable *McDonnell Douglas Corp.* burden-shifting framework, because she has failed to adduce competent evidence demonstrating that she was similarly situated to any male employees at Reliant in connection with the allegedly adverse employment actions at issue.  For instance, the plaintiff's evidence concerning Driggs' alleged favorable treatment of Anthony Wade with respect to the withholding of commissions is based on inadmissible hearsay.  Similarly, while the plaintiff claims that male MLO David Perkins also received favorable treatment from Driggs with respect to his commissions, the plaintiff has neither set forth the basis of her personal knowledge of this fact nor offered any evidence concerning whether Perkins engaged in the same conduct as she did.

The plaintiff also relies on inadmissible hearsay to support her claim that Driggs withheld leads from her that came into the Maryland Farms branch, while assigning such leads to Perkins.  Moreover, at all relevant times, the plaintiff worked at a different bank branch than Driggs and Perkins, and there is no evidence indicating that Driggs was under any obligation to direct leads received at Reliant's Maryland Farms branch to MLOs working at different branches.  Based on the plaintiff's testimony, it appears that the main branch, where she worked, had its own protocol whereby the staff was to direct all incoming leads to her, since she was the only MLO at that location.  The plaintiff did not testify at her deposition that this protocol required her or anyone else at the main branch to assign leads to MLOs located at other bank branches.

Finally, with respect to her termination claim, the plaintiff has failed to sufficiently detail what type of activity led her unnamed male comparator to, unlike her, receive coaching and counseling for violating certain unspecified bank standards.  Indeed, the record only reveals that Reliant found that this person engaged in some sort of activity in connection with his checking account.  The lack of detail surrounding this comparator's alleged activity undermines the court's ability to fully gauge whether he and the plaintiff engaged in conduct of comparable seriousness for purposes of determining whether they were similarly situated.  *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (noting that, to satisfy the similarly situated element, the plaintiff was required to show "that he and his proposed comparators were similar in all relevant respects, . . . and that he and his proposed comparators engaged in acts of comparable seriousness).  In any event, unlike her unnamed comparator, Reliant claimed that the plaintiff had a number of different work-related issues that led to her termination.

The plaintiff also claims that she was subjected to a hostile work environment at Reliant on account of her gender. In order to establish a hostile work environment claim, the plaintiff must show that "(1) she is a member of a protected class (female), (2) she was subjected to harassment, either through words or actions, based on sex, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment[,] and (4) there exists some basis for liability on the part of the employer." *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The harassment must satisfy an objective and subjective test, meaning that it "must be so severe or pervasive as to constitute a hostile or abusive working environment both to [a] reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

In determining whether the harassment was sufficiently severe or pervasive, a court must consider the totality of the circumstances. *Randolph*, 453 F.3d at 733. The court may consider a number of factors in assessing whether a hostile work environment exists, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998)). Indeed, discriminatory conduct must be extreme to constitute a change in the terms and conditions of employment. *Id.*

In seeking summary judgment, Reliant contends that the plaintiff's claim must fail because she has not presented evidence establishing that her environment was intimidating, hostile, or offensive so as to unreasonably interfere with her work performance. (Docket No. 29 at 14, 17.) It also argues that the plaintiff has failed to establish that the alleged harassment was so severe or pervasive as to alter the terms and conditions of her employment. (*Id.* at 16-17.) The plaintiff contends that she has adduced evidence demonstrating that her harassment was pervasive enough to constitute a hostile working environment. (Docket No. 44 at 13-14.)

The plaintiff's evidence of workplace harassment centers on the fact that Driggs' behavior changed in the summer of 2010, after she began winning sales performance awards, and that he made the previously described comments. The plaintiff also relies on Vice President Crenshaw's statement that she would never be able to grow and excel at Reliant "because she did not have a penis." (*Id.*)

Having considered the totality of the circumstances, the court finds that the plaintiff has failed to create a genuine dispute of material fact as to whether the alleged harassment she suffered was sufficiently severe or pervasive to alter the conditions of her employment. As an initial matter, the court notes that the evidence concerning the plaintiff's subjective perceptions of her workplace environment fails to paint a clear picture. On the one hand, the plaintiff testified at her deposition that, although she initially viewed Driggs' comments concerning the need for the men to "take back" the mortgage department to be made in jest, when Driggs repeated those comments numerous times, she began to feel that he did not want her to succeed. Drawing all inferences in the light most favorable to the plaintiff, this evidence suggests that she subjectively perceived her workplace as being hostile.

On the other hand, Reliant notes that, after Driggs began making these and other comments, the plaintiff wrote in her November 2010 Annual Performance Evaluation Employee Self-Assessment that she loved working at Reliant, adored everyone she worked with, felt totally blessed to be a part of the company, and viewed her environment as being pleasant and fun. (Docket No. 44 at 16.)  Moreover, when asked in the self-assessment whether there were any aspects of her job that prevented her from performing at her highest level or otherwise prevented her from feeling fulfilled, the plaintiff answered "[n]ope" and then inserted a smiling emoticon.[8] Perhaps more telling is the plaintiff's testimony that she initially declined a more lucrative employment offer made by F&M Bank a few months before she was terminated because she "liked Reliant Bank."  This latter testimony suggests that, at least during the months immediately preceding her termination, the plaintiff did not perceive her work environment to be hostile.

In any event, even assuming that the subjective prong was met, the plaintiff has nonetheless failed to establish that her work environment was hostile as an objective matter. Stated differently, the court believes that no reasonable jury, viewing the totality of the circumstances, could conclude from the evidence adduced by the plaintiff that the alleged harassment she suffered was so severe or pervasive as to alter the conditions of her employment.

_____

[8] At her deposition, the plaintiff explained that the comments she made in her November 2010 self-assessment were meant to describe her experiences at Reliant's main branch.  (Docket No. 52-6, at 10.)  She further testified that she did not mention Driggs' alleged behavior as an obstacle preventing her from performing at her highest level or from otherwise feeling fulfilled, because "[i]t wasn't holding me back.  I was still a top producer.  And at this point, I believe . . . he wasn't starting to take commissions of mine."  (*Id.* at 13-14.)  She added that Driggs' comments "didn't become a hurdle until I was actually fired."  (*Id.* at 15-16.)  Finally, when asked why she did not list Vice President Crenshaw's remark about not having a penis, the plaintiff testified "you've got to be careful what you list on something like this because you never know who's going to see it."  (*Id.* at 16-17.)

She remained the highest earning MLO, even after the comments began and turned down a more lucrative job offer just a few months before she was terminated.  The remarks complained of were not so extreme as to constitute a change in the terms and conditions of the plaintiff's employment and did not otherwise interfere with her work.  *See Faragher*, 524 U.S. at 788; *see also Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 344-45, 351-52 (6th Cir. 2005) (holding that a plaintiff could not make out an actionable hostile work environment claim where supervisor told vulgar jokes, placed his vibrating pager against her upper thigh on two occasions as he walked by her in the hall and asked if it "felt good," and "pulled at her overalls after she told him she was wearing a thong")  Accordingly, summary judgment will be granted to Reliant and the plaintiff's Title VII and THRA hostile work environment claims will be dismissed.

### C.      The FLSA's Outside Sales Exemption

The FLSA establishes a minimum wage for employers to pay each of their employees engaged in commerce.  29 U.S.C. § 206(a)(1).  It also requires employers to compensate such employees one and one-half times their regular hourly pay for every hour they work in excess of forty hours per week.  29 U.S.C. § 207(a)(1); *See also Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 899 (6th Cir. 2012).  However, the FLSA includes several exemptions to these requirements, which are to be narrowly construed against the employer who asserts them.  *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009).   Indeed, the employer has the burden of demonstrating that an exemption applies.  *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 471-72 (6th Cir. 1999).

At issue here is the exemption covering employees employed "in the capacity of outside salesman."  29 U.S.C. § 213(a)(1).  Such a person is defined as an employee:

> (1) Whose primary duty is:
>
> (i) making sales within the meaning of section 3(k) of the Act, or
>
> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).  In addition, "work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . [and] work that furthers the employee's sales efforts also shall be regarded as exempt work."  29 C.F.R. § 541.500(b).

As is evident from the quoted language above, the definition contains two prongs.  For purposes of the first primary duty prong, Section 3(k) of the Act defines "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).  Moreover, the "term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Determining an employee's primary duty requires consideration of all of the facts in a specific case, "with the major emphasis on the character of the employee's job as a whole."  *Id.*

As for the second prong, "the phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. § 541.701.  The phrase includes "work normally and recurrently performed every workweek," but does not include "isolated or one-time tasks."  *Id.*  The regulations also state that an outside sales employee is one "who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home."  29 C.F.R. § 541.502.  They add that "[o]utside sales does not include

sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls." Accordingly, "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property." *Id.*

The parties have filed cross-motions for summary judgment concerning the applicability of the FLSA's outside sales exemption. For their part, Reliant contends that the undisputed facts demonstrate that it properly classified the plaintiff as an outside sales employee exempt from the FLSA's minimum wage and overtime requirements. (Docket No. 29 at 17-20.) The plaintiff, on the other hand, argues that the record evidence shows that she was improperly classified as an outside sales employee. (Docket No. 33 at 6-9.) Accordingly, the plaintiff argues that she is entitled to recover unpaid compensation for the overtime hours that she worked. (Docket No. 33 at 9-11.)

### 1.    Primary Duty

The record evidence amply demonstrates that the plaintiff's primary duty was to make sales. Her July 2010 job description stated as much, noting that the plaintiff was to promote and sell mortgage products by making sales and networking calls, developing a referral base, establishing a sales and marketing plan, maintaining detailed product knowledge, and performing other duties incidental to her sales activity. (*Id.*) In addition, after the first two months of her employment, the plaintiff's compensation was derived entirely from her commissions, which, in turn, were based on the amount of revenue generated from the closed loans she produced. The plaintiff was also expected to meet certain performance standards that

included benchmarks for monthly and annual revenue. Moreover, in performing her sales duties, the plaintiff was given latitude to manage her own affairs. She was also recognized for her sales performance by earning a succession of quarterly awards. Thus, taken as a whole, the record evidence shows that the plaintiff's primary duty was to make sales. *See Olivo v. GMAC Mortg. Corp.*, 374 F.Supp.2d 545, 550 (E.D. Mich. 2004) (in determining whether an employee is an outside salesperson, "[c]ourts have considered whether the employee: (1) must solicit new business; (2) receives sales training; (3) was hired and denominated as a salesman; (4) was paid on a commission basis; (5) was required to meet minimum production standards; and (6) was subject to direct or constant supervision"); *see also* FLSA2006-11, DOL Opinion Letter from Alfred B. Robinson, Jr., Acting Administrator, 2006 WL 1094597, (Mar. 31, 2006) (noting that MLOs who sell mortgage loan packages fulfill the sales requirement of the outside sales exemption); *see also* WH-115, DOL Opinion Letter from Robert D. Moran, Administrator, 1971 WL 33052, (Jan. 15, 1971) ("[A]n employee who actually obtains an application for . . . a loan would be engaged in exempt type work; the consideration . . . being the . . . interest paid for the amount loaned") .

### 2.      Customarily and Regularly

The record is less clear as to whether the plaintiff was "customarily and regularly engaged away from" Reliant's bank branches while undertaking her sales activities. Reliant claims that the plaintiff regularly met with customers outside her office. In support of this assertion, it cites three examples where the plaintiff met with customers outside the office in connection with sales activity. Reliant also cites the fact that the plaintiff attended Chamber of Commerce meetings one to two times per month. More significantly, it relies on the four

declarations it submitted from current and former bank employees, each stating that the plaintiff spent substantial portions of time away from the office during the workweek. Reliant specifically relies on David Driggs' declaration, which states that the plaintiff was regularly out of the office making sales calls to customers, was in the office during only 20%-25% of the workweek, and spent the remainder of time outside either making the aforementioned calls or engaging in sales support duties. The declaration added that during the time the plaintiff was at a Reliant bank branch, she undertook various sales support duties, which included calling, emailing, or meeting with customers, attending sales meetings, speaking with underwriters, and completing loan paperwork. Reliant also cites the fact that the plaintiff worked before and after the bank's business hours, either in her car or at home, answering customer calls and emails, and argues that this work was incidental to and in furtherance of her outside sales activities.

The plaintiff, on the other hand, presents an altogether different picture concerning her outside sales activity. She points to her deposition testimony, wherein she stated that she spent 80-90% of her workday at either Reliant's main branch or at Maryland Farms. According to the plaintiff, most of her customers came to the office to meet with her. She contends that the work she performed before and after the bank's normal office hours was adjunct to the tasks she performed inside the office. She also argues that, while she met with customers outside the office on three occasions and attended one or two Chamber of Commerce meetings per month during the entirety of her approximately fifteen and one-half month employment period, such evidence cannot support a finding that she was customarily and regularly engaged away from Reliant's bank branches conducting sales activities.

27

Given the state of the record, the court finds that genuine disputes of material fact preclude it from granting summary judgment in favor of either party. These factual disputes center on the degree to which the plaintiff was away from the office conducting sales activities, which lies at the core of the second prong's inquiry. Accordingly, the court will deny both motions for summary judgment concerning whether the plaintiff was an exempt outside sales employee under the FLSA.

## CONCLUSION

For all of the reasons discussed herein, the Defendant Reliant Bank's Motion for Summary Judgment (Docket No. 28) will be **GRANTED** in part and **DENIED** in part, while the Plaintiff's Motion for Partial Summary Judgment (Docket No. 31) will be **DENIED**.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge